IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 07-184 |
| | ) | |
| JAMES SMITH | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANT'S MOTION TO SUPPRESS**

**I.     PROCEDURAL HISTORY**

A federal grand jury indicted defendant, James Smith, in a two-count indictment that alleges violations of Title 18, United States Code, Section 2252(a)(2). The indictment alleges that defendant distributed visual depictions of minors engaging in sexually explicit conduct on or about January 29, 2007, and that on or about January 29, 2007, defendant knowingly received visual depictions of minors engaging in sexually explicit conduct. On April 29, 2007, defendant filed a Motion to Suppress (Document No. 38), alleging that his statements should be suppressed because at the time of the interrogation defendant was "in a custodial situation," and thus, the questioning was in violation of his Fourth and Fifth Amendment rights. A Suppression Hearing was held before this Court on January 9, 2008, during which the government called United States Postal Inspector Joseph Bellissimo (hereinafter "Bellissimo") as its sole witness. The defendant offered no evidence.

After hearing the testimony of Bellissimo, and after careful consideration of the government's Proposed Findings of Fact and Conclusions of Law, as well as the defendant's Proposed Findings of Fact and Conclusions of Law, this Court will deny defendant's Motion to Suppress (Document No. 38).

**II.     FINDINGS OF FACT**

1.     Bellissimo has been a United States Postal Inspector for 17 years, and as a postal inspector he investigates crimes against children, including child pornography, child abduction, and child pornography.  Prior to becoming a postal inspector, Bellissimo worked for the Federal Bureau of Investigation.  (Transcript of Suppression Hearing ("S.H.") January 9, 2008 (Document No. 48) at 4).

2.     Bellissimo became involved in the investigation defendant in October of 2006.  The case involved an undercover computer-based investigation relating to an individual (later determined to be defendant), who was corresponding in chat groups related to incest and sex with children (S.H. at 5).

3.     The discussions between an undercover inspector and defendant progressed to specific discussions and plans for defendant to have sex with the undercover inspector's alleged 7 year-old daughter.  On January 18, 2007, defendant directed the undercover inspector to take photographs of the girl in specific positions in order to teach or prepare the daughter to have sex with defendant.  The photos were then to be mailed to defendant's residence. (S.H. at 6 – 7).

4.     A plan was devised to conduct a controlled delivery of 10 photographs containing child pornography, similar to those requested by defendant, by priority mail, to defendant's residence. (S.H. at 7, 19).

5.     Bellissimo has engaged in "hundreds" of search warrants and the standard operating procedures for the instant search and the number of personnel present at the controlled delivery was consistent with prior searches.  (S.H. at 8).

6. On January 29, 2007, at approximately 1:35 p.m, Bellissimo, along with five others, executed the controlled delivery at the defendant's residence at 1939 Dartmore Street, Pittsburgh, Pennsylvania, 15210. Defendant received the package and, pursuant to the plan, the surveillance team waited three to four minutes before approaching the residence. (S.H. at 9).

7. Bellissimo and a uniformed Pittsburgh police officer then approached the house and knocked on the door. Defendant voluntarily opened the door, and Bellissimo observed defendant holding the opened child pornography package. (S.H. at 10).

8. After Bellissimo identified himself, he told defendant that he had a search warrant, that the team needed to clear the residence for everyone's safety, and that they needed to talk to him about the contents of the priority mail package. During the execution of the search warrant, no weapons were drawn. (S.H. at 11-12).

9. After the residence was cleared, Bellissimo and Agent Denise Holtz (hereinafter "Holtz") asked defendant if there was a place where they could sit down and talk. Defendant chose an upstairs bedroom, and once in the bedroom, Bellissimo and Holtz told defendant repeatedly that "he was not under arrest, he wouldn't be arrested today, that he was free to leave at any point and that he didn't have to answer our questions." (S.H. at 12).

10. Bellissimo told defendant that if he chose to leave the residence, the search warrant would continue being executed and that he may walk around the home so long as a law enforcement agent accompanied him. (S.H. at 12-13).

11. Defendant responded to Bellissimo and Holtz's statements that he was not under arrest, and that he need not speak to them, by agreeing to talk and proceeding to make statements. Bellissimo

did not Mirandize defendant because Bellissimo determined it not to be a custodial interview. (S.H. at 13-14).

12. The interview lasted for 35 to 45 minutes, during which no weapons were drawn nor visible. The interviewers (Bellissimo and Holtz) used conversational tones. At the conclusion of the interview, Bellissimo and defendant went over the search warrant's inventory, defendant initialed and signed the document, and defendant was provided with a copy of the search warrant. (S.H. at 14-17).

13. During the interview, defendant appeared coherent and oriented as to time and place, appeared to understand the questions asked, had a command of the English language, and appeared to have some computer literacy. At the time of the interview, defendant was 49 years old and employed. At no time did defendant ask for a lawyer or ask to stop the interview. (S.H. at 16-18).

14. On January 29, 2007, Bellissimo and the other officers did not arrest defendant, did not restrain him at any point, and did not make promises or induce defendant to talk. (S.H. at 15).

15. On January 30, 2007, the criminal complaint was executed and defendant was arrested. All the evidence used in support of the criminal complaint was in Bellissimo's possession on January 29, 2007, at the time of the execution of the search warrant. (S.H. at 27).

16. Bellissimo has performed deliveries of child pornography where arrests were never made. (S.H. at 29).

17. On January 29, 2007, at the time of the search warrant execution, Bellissimo did not know if he would obtain an arrest warrant from the United States Attorney and whether defendant would be arrested and charged with any offense involving child pornography. (S.H. at 22).

18. Bellissimo believed that the "whole picture" needed to be looked at to determine whether an arrest should be made and that the decision to make an arrest "wasn't a formula." Bellissimo believed that if the only child pornography in the residence was the pornography delivered on January 29, 2007, then other factors would need to be reviewed prior to making an arrest. (S.H. at 24, 29).

19. At the time of execution of the search warrant, Bellissimo was not sure if defendant's young daughter was residing in the home for part of the time.

20. The Court, after listening to the testimony of Bellissimo and observing his demeanor, finds his testimony to be credible.

### III. CONCLUSIONS OF LAW

1. Defendant's voluntary statements made to Bellissimo and Holtz did not occur as a result of a custodial interrogation. The agents were not required to read his Miranda rights, and the Defendant's Motion to Suppress is denied. *Miranda v. Arizona*, 384 U.S. 436 (1966).

2. The requirement to provide *Miranda* warnings arises only when the officers conduct a "custodial interrogation." *Miranda*, 384 U.S. at 444.

3. A "custodial interrogation" is not susceptible to an exact definition and the determination of whether statements are a result of such interrogations must be made on a case by case basis. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974).

4. In determining whether an individual is "in custody" for purposes of *Miranda*, "a court must examine all of the circumstances surrounding the interrogation." The ultimate inquiry is whether at the time of the interrogation there has been a "'restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994).

5

5.  The custody determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogation officers or the person being questioned." *Id.* at 323. "The relevant inquiry is how a reasonable man in the suspect's position would have understood his situation" in terms of whether he was free to terminate the interrogation and leave. *Id.* at 324.

6.  The Court finds that the circumstances surrounding the interrogation (as summarized below) would lead a reasonable man in defendant's position to have understood that he was free to depart, and that defendant was not in a "custodial interrogation":

    a.  Defendant was told repeatedly that he was free to leave, that he need not speak to the agents, and that he was not under arrest. Defendant was not arrested at any time on January 29, 2007 and at no point mentioned an attorney or invoked a right to counsel.

    b.  There was an absence of formal indicia of custody, such as being arrested, handcuffed, or told that he was under arrest or not free to leave.

    c.  The interview lasted a short duration and occurred in the bedroom of defendant's choosing, in his own home. Defendant departed the room upon the conclusion of the interview voluntarily and following the conclusion of the search remained in his home unencumbered.

    d.  The agents used a conversational tone during the interview, did not threaten or coerce defendant at any time, and did not engage in or threaten any physical restraint or detention. Both agents interviewing defendant did not have weapons drawn or a firearm exposed.

    e.  The controlled delivery and search was consistent with protocol and did not involve an excessive show of force. Defendant's freedom was not restricted in any manner and he was never restrained at any time during the search.

7.  In making a determination of whether a defendant was subject to custodial detention, the United States Supreme Court has given a restrictive meaning to the definition of "custody." In *Minnesota v. Murphy*, the Court rejected the contention that a probation interview was

6

comparable to a custodial interrogation for purposes of *Miranda* warnings, pointing out that the defendant was free to leave if he so desired. *Minnesota v. Murphy*, 465 U.S. 420, 433 (1984) (Since the defendant "was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator.").

8. The interview with defendant was not comparable to a custodial interrogation for purposes of *Miranda* warnings because defendant was not physically restrained, was free to leave if he so desired, and was not under any undo pressure.

9. Where the individual has not been openly arrested when statements are made, "something must be said or done by the authorities, either in their manner or approach or in the tone or extent of the questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *Steigler*, 496 at 799. The agent's conduct during the interview, specifically the conversational tones used and the short length of the dialogue, coupled with the fact that defendant was told that he was free to leave at any point and need not answer any questions, supports the conclusion that the statements made were not the product of a custodial interrogation.

10. "Police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings imposed simply because . . . the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). The agents were not required to read defendant his *Miranda* rights simply because he was questioned or because he was one whom they suspected.

11. Where a defendant is free to leave the situation if he so desires, *Miranda* warnings are not required. (*See California v. Beheler*, 463 U.S. 1121, 1125 (1983) holding "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the question person is one whom the police suspect.'"). Defendant was advised that he was free to leave and accordingly *Miranda* warnings were not required.

12. With respect to whether a statement is voluntary, the question is whether "the suspect's will was overborne in such a way as to render his confession the production of coercion." *Lam v. Kelchner*, 304 F.3d 256 (3d Cir. 2002). In determining whether the confession was given voluntarily, the Court "must determine whether the confession was the product of an essentially free and unconstrained choice by its maker" and "whether it was product of rational intellect and free will." *United States v. Bethancourt*, 65 F.3d 1074 (3d Cir. 1995).

13. The fact that defendant's will was not "overborne" at the time the confession was made is evident in the fact that he responded to the agent's statements that he was not under arrest and that he need not speak to them by agreeing to talk and voluntarily making statements.

14. The fact that defendant's confession would not have been made in the absence of the interrogation is irrelevant in determining whether the statements made were voluntarily. *See Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986) (holding that the "test for voluntariness is not a but-for test: we do not ask whether the confession would have been made in the absence of the interrogation.").

15. The Court must consider the effect that the totality of the circumstances had upon the will of the defendant in determining the voluntariness of a confession. Factors to be considered include:

> the youth of the accused; his lack of education or his low intelligence; the lack of any evidence to the accused of his constitutional rights; the length of the detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as deprivation of food or sleep. *Id.* at 604.

16. The characteristics of defendant as well as the circumstances in which the statements were made also point to the conclusion that the confession was voluntary. Specifically, defendant was 49 at the time of the interview, literate, and had some degree of computer literacy. Also, the interview lasted only 35 to 45 minutes, in the absence of any deprivation of food or sleep or any other physical punishment.

17. The "Court will not hold that confession was involuntary unless it finds that it was the product of police overreaching." *United States v. Swint*, 15 F.3d 286 (3d Cir. 1994). Under the facts of this case, not only was there an absence of police overreaching, the agents involved in the interview were respectful and allowed defendant to exercise his own choices in picking a location to speak with the agents and in making his statements, and that location happened to be his bedroom.

18. "A policeman's unarticulated plan has no bearing on the question of whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). Bellissimo and the other agent's subjective intent, plans, and ability to arrest defendant on January 29, 2007 is irrelevant.

19. Finally, a reasonable person in defendant's situation would not have believed that he was in custody.

20. For the reasons set forth hereinabove, the Court finds that because defendant's interview was not conducted in a custodial context and because defendant's statements were voluntary, the defendant's Motion to Suppress (Document No. 38) is DENIED.

SO ORDERED this 24th day of April, 2008.

s/Arthur J. Schwab
Arthur J. Schwab
United States District Judge